UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RONALD JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:08-cv-806-SEB-JMS |
| | ) | |
| VERIZON WIRELESS, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment [Docket No. 36], filed on June 15, 2009, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1.  Plaintiff, Ronald Jackson, brings his claim against his current employer, Defendant, Cellco Partnership d/b/a Verizon Wireless ("Verizon"),[1] for its allegedly discriminatory actions toward him based on his race (African-American),[2] in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq* and 42 U.S.C. § 1981.  For the reasons detailed below, we <u>DENY</u> Defendant's

---

[1] In its brief in support of its summary judgment motion, Defendant states that it was incorrectly identified in the caption as "Verizon Wireless."  However, Defendant has not moved to amend the caption.

[2] In his complaint, Mr. Jackson also alleged that Verizon discriminated against him based on his gender (male) in violation of Title VII and Section 1981.  However, in his responsive briefing on this motion, Mr. Jackson stated that he does not contest Verizon's motion for summary judgment on his gender discrimination claim.  Accordingly we <u>GRANT</u> Defendant's Motion for Summary Judgment on that claim.

Motion for Summary Judgment as to Plaintiff's race discrimination claim.

**Factual Background**

On February 7, 2005, Mr. Jackson began working for Verizon as a retail representative at Verizon's kiosk located in the Lafayette Square Mall in Indianapolis, Indiana. Deposition of Ronald Jackson ("Jackson Dep.") at 44. As a retail representative, Mr. Jackson's job duties include selling Verizon cell phone products, accessories, and data services, as well as providing customer service. Verizon retail representatives, such as Mr. Jackson, are evaluated on various criteria, including the number of new activations, upgrades, and accessory sales they generate. Id. at 56-57. Mr. Jackson worked at the Lafayette Square Mall kiosk until the location closed in September 2008, at which point he moved to Verizon's Centre West store, located at 4525 Lafayette Road, Indianapolis, Indiana, where he currently remains employed. Id. at 46; Affidavit of Donita Brooks ("Brooks Aff.") ¶ 8. Mr. Jackson's manager is Andre Johnson. Brooks Aff. ¶ 9.

**Defendant's Failure to Hire Plaintiff for Open Sales Representative Position**

On August 22, 2007, Mr. Jackson applied for a vacant retail sales representative position at Verizon's Castleton location.[3] On September 1, 2007, before a hire had been

---

[3] Although in his briefing on this motion, Mr. Jackson characterizes the open positions at
(continued...)

made for that open position, an additional Verizon sales representative position opening was posted for the Castleton location. Elizabeth Hill, the Castleton store manager, acted as hiring manager at the Castleton store and conducted the applicants' interviews for the open positions. Brooks Aff. ¶ 11. Theodore ("Ted") Wendling, the District Manager of Retail Sales in Indianapolis, Indiana, was responsible for approving or declining Ms. Hill's hiring recommendations and attended the interviews when available. Affidavit of Theodore Wendling ("Wendling Aff.") ¶ 5.

A sufficient number of internal candidates applied for the open positions, so no outside candidates were solicited or considered by Verizon. Deposition of Elizabeth Hill ("Hill Dep.") at 40. Nine Verizon employees ultimately applied for the open positions at the Castelton location, and, because the two openings had occurred in such close succession, candidates who applied for either of the openings were considered for both of the open positions. Wendling Aff. ¶ 10. The final applicants included: (1) Mr. Jackson, an African-American male; (2) Alexandria Wilson, an African-American female; (3) Branden Lienemann, a Caucasian male; (4) Terrell Washington, an African-American male; (5) Jamillah Perry, an African-American female; (6) Tazae Hughes, an African-American male; (7) Katie Hall, a Caucasian female; (8) Tammie Kery, a Caucasian female; and (9) Elaina Morton, a Caucasian female. Brooks Aff. ¶ 14.

---

[3](...continued)
the Castleton location as a promotion, in his deposition, he testified that he applied for two lateral transfers to Verizon's Castleton location. Jackson Dep. at 98. Verizon contends that, had he been chosen for one of the open positions, it would have been merely a lateral transfer, not a promotion.

Because Mr. Jackson met the minimum requirements to be a sales representative, he received an interview for the Castleton openings, which took place on August 31, 2007.  Id. ¶ 15.  Ms. Hill testified that, before the interview, Mr. Wendling had already determined that he did not want to hire Mr. Jackson because he did not think he [Mr. Jackson] would "be a good fit" at the Castleton location.  Hill Dep. at 104-105.  Despite this alleged comment, Ms. Hill and Mr. Wendling interviewed Mr. Jackson, and, as part of the hiring process, they also reviewed Mr. Jackson's sales performance.  During his interview, Ms. Hill informed Mr. Jackson that one of her objectives was to hire someone who could increase the store's sales of Verizon accessories.  Hill Dep. at 44-45.

Upon review of Mr. Jackson's sales numbers, Ms. Hill observed that Mr. Jackson's accessory sales were "low" (id. at 44) and Mr. Wendling noted that Mr. Jackson regularly failed to meet Verizon's expectations for accessory sales.  Wendling Aff. ¶ 13.  However, Ms. Hill testified that those numbers had to be considered with reference to his location because the Lafayette Square location, where Mr. Jackson worked at the time, "gets no business."  Hill Dep. at 121-122.  Despite this obstacle, Mr. Jackson was one of the top overall sellers at the Lafayette Square store from March 2007 to the time of his interview.[4]  See Pl.'s Exh. B.

During the interview, Ms. Hill and Mr. Wendling observed that Mr. Jackson had

---

[4] Although Ms. Hill and Mr. Wendling believed his accessory sales to be below par, Mr. Jackson was consistently at, or near, the top of the "Sales Whiteboard" from March 2007 through August 2007 for other sales.  Pl.'s Exh. B.

difficulty maintaining eye contact with them, and Ms. Hill testified that she believed that good eye contact was a necessary skill for a sales representative to possess in order to build trust with customers.[5] Hill Dep. at 45-46; see also Wendling Aff. ¶ 14. Additionally, Mr. Wendling determined that Mr. Jackson's communication skills were not as strong as those of the other applicants. Because a sales representative needs to effectively communicate with customers, Mr. Wendling was concerned about Mr. Jackson's deficiencies in this area. Wendling Aff. ¶ 15. Following his interview, neither Ms. Hill nor Mr. Wendling recommended that Mr. Jackson remain under consideration for either of the open positions. Wendling Aff. ¶ 24.

After interviewing Mr. Jackson, both Ms. Hill and Mr. Wendling completed evaluation forms. Initially, Ms. Hill gave Mr. Jackson a four out of five ("More than Acceptable") rating for both "Sales Ability/Persuasiveness" and "Decision-Making/Critical Thinking." However, after discussing the ratings with Mr. Wendling, Ms. Hill lowered her ratings to match Mr. Wendling's; after the changes, Mr. Jackson ultimately received a three out of five ("Acceptable") rating for "Sales Ability/Persuasiveness" and a two out of five ("Less than Acceptable") rating for "Decision Making/Critical Thinking." Hill Dep. at 49-50. Although Ms. Hill does not recall the precise reason for changing her rankings, she testified that she did so in order to

---

[5] When Ms. Hill called Mr. Jackson to notify him that he had not been selected for either position, she advised him to improve his eye contact and provide an action plan for future interviews. Hill Dep. at 53-54.

match Mr. Wendling's because "[t]hat's how we've always done it." Id. at 50. Ms. Hill stated that, when she strongly disagreed with Mr. Wendling's ratings, she would "voice [her] opinion." Id. However, Ms. Hill also testified that, although she is comfortable with Mr. Jackson's rankings, she would not have ranked him as low as Mr. Wendling advised and that the decision not to recommend him for further consideration was more Mr. Wendling's decision than hers. Id. at 111, 119.

**Defendant's Hiring Decision**

Alexandria Wilson (African-American female) and Branden Lienemann (Caucasian male) were ultimately chosen for the two openings at the Castleton store. At the time they were hired for the sales representative positions, both Ms. Wilson and Mr. Lienemann already worked at the Castleton store under Ms. Hill's supervision[6] as retail customer support representatives. Verizon customer support representatives have some sales and customer service responsibilities. Hill Dep. at 56; Wendling ¶ 20. According to both Ms. Hill and Mr. Wendling, Ms. Wilson had demonstrated a strong work ethic and sales performance and potential in the course of her duties as a customer support representative. Hill Dep. at 57; Wendling Aff. ¶ 20. Ms. Wilson received a rating of "More than Acceptable" (four out of five) on all criteria by both Ms. Hill and Mr. Wendling, based, *inter alia*, on her previous performance as a Verizon employee; the fact

---

[6] At the time Mr. Jackson applied for the openings at the Castleton store, Ms. Hill did not know him or otherwise have any previous dealings with him.

that she brought an action plan to her interview; her impressive sales numbers, particularly in accessory sales; and the quality of answers she provided at her interview. Hill Dep. at 58-61; Wendling Aff. ¶ 21.

Mr. Lienemann, who was hired to fill the second open position at Verizon's Castleton location, received an overall rating of "More than Acceptable" by Ms. Hill, with no score lower than a three out of five on any criterion. Ms. Hill stated that Mr. Lienemann had demonstrated, both in the interview and through his prior performance, that he was very dedicated to his work; he had good sales results; was an effective communicator; and was a "great asset" to Verizon. Hill Dep. at 69-71. However, she noted that, during his interview, Mr. Lienemann had sweaty hands, and seemed nervous and shaky with his words. Id. at 67. Moreover, Ms. Hill testified that, while she believed Mr. Lienemann was a good employee, she did not feel that he was ready for a sales position and that he was not her first choice to fill one of the open positions. Id. at 62-63, 81. Although Mr. Wendling did not participate directly in this interview,[7] Mr. Lienemann ultimately was hired in part at least because Mr. Wendling said that Mr. Linemann was the candidate that he would support and approve for the job. Id. at 72. Mr. Wendling testified by affidavit that Mr. Lienemann had demonstrated, in the course of his duties as a retail customer support representative at the Castleton location, his work ethic, sales performance and potential, and that he was a good "fit" at the Castleton store. Wendling

---

[7] Ricky Taylor, Ms. Hill's assistant manager, rather than Mr. Wendling, participated with Ms. Hill in Mr. Lienemann's interview. Hill Dep. at 66-66.

Aff. ¶ 20.

**Plaintiff's Allegations of Race Discrimination**

During her deposition, Ms. Hill testified that her top choice for the position filled by Mr. Linemann was Tazae Hughes, an African-American male. Hill Dep. at 72. However, according to Ms. Hill, although Mr. Wendling had not participated in Mr. Lienemann's interview, Mr. Wendling indicated that she needed to hire Mr. Lienemann rather than Mr. Hughes because "[o]ur ratio in our store [had become] too dark so we needed to hire a white person."[8] Hill Dep. at 73-74. Mr. Wendling denies making this statement and asserts that he was never told by Verizon's Human Resources Department to maintain any racial balance in hiring for the open Castleton positions. Wendling Aff. ¶¶ 26-27. He testified by affidavit that he did not recommend Mr. Hughes for the position because he believed Mr. Hughes was complacent with his sales numbers and that he needed to articulate his thoughts more clearly, "with fewer pauses and 'umms.'" Id. ¶ 28, Exh. 4. Despite these observations, Mr. Wendling still ranked Mr. Hughes as "recommended" for the position, yet ultimately did not support Ms. Hill's recommendation that he be placed in the position. Id.

---

[8] Prior to the filing of the instant lawsuit, Ms. Hill hired Keith Johnson, an African-American male, for a retail sales position with Mr. Wendling's approval and subsequent to hiring Ms. Wilson and Mr. Lienemann, Ms. Hill hired two males – one a Hispanic and the other an African American – for the next two open positions. Hill Dep. at 75-76. Ms. Hill no longer works for Verizon, but the circumstances surrounding Ms. Hill's current employment status are not clear from the record.

Mr. Jackson also alleges that DeJuan McKnight, a store manager for Verizon in Carmel, Indiana, told him that he (Mr. McKnight) could not hire any African-American applicants at his store because he had been advised by Verizon's Human Resources Department that Verizon was required to keep its stores "balanced." Jackson Dep. at 115-116, 179-181. Ms. Hill testified by deposition that Mr. McKnight had made a similar statement to her, complaining that he was not allowed to hire who he wanted to hire because he had been told that there were "too many black people" at his store. Hill Dep. at 81-84, 117-118.

**Defendant's Employment Policies**

Verizon has a Code of Conduct that is distributed to all newly-hired employees, which provides, in relevant part:

> Verizon Wireless has a policy of zero tolerance for discrimination, sexual harassment, or other unlawful harassment based on age, race, color, national origin, religion, gender, sexual orientation, disability, marital status, citizenship status or any other legally protected category under federal, state or local law.

Exh. 15 to Jackson Dep.; Exh. 1 to Brooks Aff.

The Code of Conduct also explicates the procedures to be followed by Verizon employees if they feel that have been subjected to unlawful harassment, discrimination, or retaliation. Although Mr. Jackson concedes that he reviewed the Code of Conduct, including the internal reporting procedures for complaining of alleged discrimination or harassment, at no point prior to filing his charge with the Equal Employment Opportunity

Commission ("EEOC") did he lodge an internal complaint alleging that he had been the victim of unlawful discrimination in connection with his failure to receive the Castleton sales representative position.

**The Instant Litigation**

After timely filing his EEOC charge alleging discrimination based on race and gender, Mr. Jackson received his Dismissal and Notice of Rights. On June 16, 2008, Mr. Jackson filed his complaint in this action, alleging that Verizon discriminated against him based on his race and gender in violation of Title VII and Section 1981, when it failed to place him in one of the open sales representative positions for which he applied at Verizon's Castleton location.

## Legal Analysis

**I.      Standard of Review**

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party

and draws all reasonable inferences in favor of the non-moving party.  See id. at 255.  However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v.

AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available. Seener v. Northcentral Technical Coll., 113 F.3d 750, 757 (7th Cir. 1997); Wohl v. Spectrum Mfg., Inc., 94 F.3d 353, 354 (7th Cir. 1996). To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination. However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997).

**II.   Discussion**

Mr. Jackson has brought his claim for race discrimination under both Title VII and

§ 1981. While the type of discrimination prohibited by § 1981 is different from that prohibited by Title VII,[9] courts "employ essentially the same analytical framework to employment discrimination cases whether they are brought under . . . Title VII[] or § 1981." Cerutti v. BASF Corp., 349 F.3d 1055, 1061 n.4 (7th Cir. 2003) (citations omitted). A plaintiff may prove employment discrimination either with direct evidence of discrimination or indirectly through the burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Scaife v. Cook County, 446 F.3d 735, 739 (7th Cir. 2006). Mr. Jackson asserts that he is able to prove his case under either method, so we begin by addressing his claim under the direct method of proof.

Using the direct method, Mr. Jackson must produce either direct or circumstantial evidence which shows that he was discriminated against during the selection process because of his race. Mach v. Will County Sheriff, 580 F.3d 495, 499 (7th Cir. 2009) (citations omitted). Direct evidence of race discrimination is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer "without reliance on inference or presumption." Rudin v. Lincoln Land Cmty. College, 420 F.3d 712, 720 (7th Cir. 2005) (internal quotation and citation omitted). Such evidence typically requires an admission of discriminatory animus, which is rare. However, a

---

[9] Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's sex." 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides in relevant part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a).

plaintiff may also meet his burden under the direct method of proof through the use of circumstantial evidence, which allows the trier of fact to find intentional discrimination by the decisionmaker through a chain of inferences. Sun v. Bd. of Trustees of Univ. of Ill., 473 F.3d 799, 812 (7th Cir. 2007) (citation omitted).  Under Seventh Circuit law, a plaintiff may rely on the following types of circumstantial evidence:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

Id. (citation omitted).

The first open position at the Castleton location was filled by Ms. Wilson, an African-American female.  However, it is Verizon's process of filling the second opening that Mr. Jackson contends was fraught with intentional race discrimination.  As direct evidence that he was screened out of the selection process and not chosen to fill the second open position because of his race, Mr. Jackson first points to Ms. Hill's testimony that Mr. Wendling instructed her to choose Mr. Lienemann, a Caucasian male, rather than Mr. Hughes, an African-American male whom she had recommended for the second open position, because the Castleton store had become "too dark."  Hill Dep. at 73-74.  In further support of his claim under the direct method of proof, Mr. Jackson cites to the statement allegedly made by the manager of Verizon's Carmel location, Mr. McKnight, in response to Mr. Jackson's inquiry about open positions available at that location, that he

(Mr. McKnight) had been instructed to keep staffing at the Carmel store "balanced." Jackson Dep. at 115-116, 179-181. Although Mr. McKnight did not elaborate and Mr. Jackson did not clarify what Mr. McKnight meant by that comment, Ms. Hill testified that, in reference to a particular position that had been filled in Carmel, Mr. McKnight had told her that "he couldn't have who he wanted because he had to hire a white person." Hill Dep. at 82.

    Mr. Jackson contends that these statements, coupled with Ms. Hill's testimony that Mr. Wendling had already predetermined that he did not want Mr. Jackson working at the Castleton store, that she would have given Mr. Jackson higher scores on his evaluation than he ultimately received, and that the decision not to recommend Mr. Jackson for further consideration for the position was more Mr. Wendling's decision than hers, at the very least raises a genuine issue of material fact regarding whether his treatment runs afoul of Title VII and § 1981. Verizon rejoins that the statements Mr. Jackson cites as direct evidence of discrimination were not directed at him and had no impact on his non-selection for any position at issue and thus are not relevant to show that he was discriminated against because of his race. In essence, Verizon argues that, because Mr. Jackson challenges only the company's final decision not to hire him for the second open position at Castleton, rather than challenging the fairness of the selection process in general, he cannot survive summary judgment because there is undisputed proof in the record that, regardless of any unlawful discrimination, Mr. Jackson would not have been selected for the position since Mr. Lienemann and Mr. Hughes were the only two

employees considered as final candidates to fill the second opening.

However, as the Court has previously recognized, "Title VII [and] Section 1981 . . . are offended by discrimination at any point in the selection process." Shipley v. Dugan, 874 F. Supp. 933, 937 (S.D. Ind. 1995) (Tinder, J.). Thus, "[i]f the process is discriminatory at any stage, [a plaintiff] is entitled to relief regardless of [his] qualifications relative to those ultimately hired." Id. at 942 (citations omitted). In such a case, a prevailing plaintiff "is entitled to an injunction against future, or continued, discrimination. The purpose of such an order is to ensure that, at the very least, the applicant will receive full and fair consideration from the employer if he seeks similar employment in the future." Id. Here, while there is no direct evidence that Mr. Jackson was the victim of a discriminatory hiring process, there is clearly sufficient circumstantial evidence to raise a genuine issue of material fact under the direct method of proof regarding whether Verizon's selection process was tainted by discrimination, thereby negatively affecting Mr. Jackson.

There is evidence in the record that Mr. Wendling ultimately directed Ms. Hill to hire Mr. Lienemann, rather than Mr. Hughes, an African-American male, for the second open position at issue in this litigation because the Castleton store had become "too dark."[10]  Ms. Hill also testified that, earlier in that same selection process, Mr. Wendling

---

[10] As discussed above, Ms. Hill also testified that Mr. McKnight, manager of Verizon's Carmel location, told her that he had received a similar instruction on one particular occasion when he wanted to hire an African-American candidate at his store.

had predetermined before interviewing Mr. Jackson that he was not going to hire him, stating only that "he didn't feel like he'd [Mr. Jackson] be a good fit for the store. Hill Dep. at 104-105. After Mr. Jackson's interview, Mr. Wendling advised Ms. Hill to change her evaluation of Mr. Jackson and lower her rankings to match his and was allegedly influential in the decision not to recommend Mr. Jackson for further consideration for the Castleton sales representative position. Viewing the evidence in the light most favorable to Mr. Jackson, as we are required to do at this stage of the proceedings, we find that, while each individual piece of evidence may not be sufficient to show discrimination, together they create a "convincing mosaic of circumstantial evidence" from which a reasonable jury could infer that the selection process was discriminatory.

As discussed above, if Mr. Jackson can prove that Mr. Wendling effectively screened him out of the selection process based on the impermissible characteristic of race, Mr. Jackson will be entitled to an injunction prohibiting such behavior in the hiring process in the future. If, at trial, Mr. Jackson is able to make such showing, Verizon may then prove mitigation of the harm by demonstrating that, even if the process had been fair, Mr. Jackson would not have been chosen because he was not the most qualified applicant. See Shipley, 874 F. Supp. at 942. However, we are unable to decide these issues without the benefit of a trial as they will likely turn largely on credibility determinations, particularly with regard to Mr. Wendling's and Ms. Hill's testimony, which are not susceptible to a decision at the summary judgment stage. Accordingly, Verizon's Motion

for Summary Judgment with regard to Plaintiff's race discrimination claim must be

DENIED.[11]

### III.   Conclusion

For the reasons detailed above, we GRANT IN PART Defendant's Motion for

Summary Judgment as to Plaintiff's gender discrimination claim and DENY IN PART

Defendant's Motion for Summary Judgment on Plaintiff's race discrimination claim.

Trial on the merits of these issues will proceed as scheduled.

IT IS SO ORDERED.

Date:   10/28/2009

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

---

[11] Because, for the reasons described *supra*, we find that there is sufficient evidence under the direct method of proof to preclude summary judgment, we need not address the parties' arguments under the burden shifting method.

Copies to:

Bonnie L. Martin
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
bonnie.martin@odnss.com

Joel Samuel Paul
lawjoel@hotmail.com

Brandon M. Shelton
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
brandon.shelton@ogletreedeakins.com